IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT O. STEIN, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>PACIFIC BELL, et al.,<br><br>            Defendants.<br>_____/ | No. C 00-2915 SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING DEFENDANTS' MOTION TO EXCLUDE REPORT AND TESTIMONY OF WILSON AND BRAUNSTEIN** |

Now pending before the Court are defendants' motions for summary judgment and to exclude reports and testimony of plaintiff's experts. Having carefully considered the arguments of the parties and the papers submitted, the Court GRANTS defendants' motion for summary judgment; GRANTS defendants' motion to exclude the reports and testimony of plaintiff's experts Wilson and Braunstein; and DENIES plaintiff's alternative request for a Fed. R. Civ. P. 56(f) continuance.

**BACKGROUND**

**1.    Factual background**

Plaintiff Albert O. Stein brings this action on behalf of himself and others similarly situated to challenge alleged anticompetitive conduct by defendants (collectively "Pacific Bell"), relating to the offering of Digital Subscriber Line ("DSL") service. DSL is a transmission service that provides consumers with dedicated, high-speed access to the internet and other computer networks. Third Amended Complaint ("TAC") ¶ 19. Utilizing technology that permits simultaneous data exchange over

traditional transmission lines, DSL service is provided through already existing telephone networks and facilities, thus allowing users to have concurrent access to the internet and traditional telephone service. *Id*.

Pacific Bell is an incumbent local exchange carrier ("ILEC"), as defined by the Telecommunications Act of 1996 ("Telco Act"). Section 251 of the Telco Act requires ILECs such as Pacific Bell to make their telephone networks available to competitors through interconnection agreements with these competitors, referred to as competitive local exchange carriers ("CLECs") and Internet Service Providers ("ISPs"). *Id*. ¶¶ 20-21. Pacific Bell entered into several interconnection agreements with DSL competitors.

Plaintiff's claims focus on two aspects of the regulatory scheme created by the Telco Act: collocation space and loops. Collocation refers to an ILEC's obligation to make space available in central switching offices for the competing carrier to place equipment necessary for interconnection or access to the incumbent's network. *See* 47 U.S.C. § 251(c)(6). Plaintiff alleges that Pacific Bell "consistently failed to provide collocation space to requesting CLECs on a timely schedule, as was required by its interconnection agreements." TAC ¶ 24. Stein also alleges that Pacific Bell violated an FCC regulation requiring that notice be posted when space in a central office is exhausted, *id*. ¶ 25, and that Pacific Bell failed to comply with its contractual obligations to provide "planning data" for, and allow inspections of, central offices for which collocation requests were denied due to lack of space. *Id*. ¶¶ 26-27.

Plaintiff's other claim concerns loops. Loops are the individual phone lines that run from the telephone company's switching office to individual customer premises. The Telco Act requires that, upon request from a competing carrier, incumbents lease these loops, at cost-based rates, to permit the requesting carrier to provide its own telecommunications service to the customer served by the loops. *See* 47 U.S.C. §§ 251(c)(3), 252(d). ILECs are also required to provide information about the suitability of a given loop to support the service at issue, i.e. "loop qualification information." Plaintiff alleges that, "[a]lthough Pacific had the contractual and statutory duty to provide CLECs and ISPs with accurate and non-discriminatory loop qualification information, it failed to fulfill this obligation throughout the Class Period." *Id*. ¶ 32.

2

Plaintiff claims that defendants' anticompetitive conduct denied consumers a competitive choice in DSL service providers and caused them to pay supra-competitive rates for the DSL service they obtained from defendants.

**2.     Procedural background**

Plaintiff filed this case on August 11, 2000, alleging claims under section 2 of the Sherman Act, 15 U.S.C. §§ 1 et seq.; the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.; the Telco Act, 47 U.S.C. § 151 et seq.; and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

On February 25, 2002, the Court dismissed the Telco Act claim, finding that as a consumer, plaintiff lacked standing to pursue such a claim. In the same order, the Court also dismissed the Cartwright Act claim. On July 25, 2002, the Court certified a class with respect to the antitrust and UCL claims. The class consisted of all California subscribers to defendants' DSL services between May 20, 2000 and September 30, 2001.[1] Neither the Court's class certification order nor the class notice included the Telco Act claim because the Court had dismissed that claim prior to certification.

On March 4, 2004, the Court granted summary judgment to defendants on the remaining antitrust claims based on the Supreme Court's decision in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004). The Court also dismissed the UCL claim without prejudice, declining to exercise its discretionary jurisdiction over this claim.[2] Plaintiff appealed to the Ninth Circuit.

In a decision dated March 22, 2006, the Ninth Circuit affirmed the summary judgment on the antitrust claim, and reversed the dismissal of the Telco Act claim. The court held that Sections 206 and 207 of the Telco Act "create a private right of action, thereby enabling Stein to sue for a violation of the

---

[1] In an earlier order filed on February 3, 2001, the Court held that the filed-rate doctrine barred claims alleging that defendants' anticompetitive conduct resulted in payment of supra-competitive prices for Pacific Bell DSL service. Plaintiff then amended the complaint and redefined the class period so as to avoid the filed-rate doctrine. Pacific Bell ceased to provide DSL service and withdrew its federal tariff in May 2000. From that point forward, SBC Advanced Solutions, Inc. ("ASI") became the SBC-affiliated provider of DSL service in California. ASI's DSL service was not tariffed until September 2001. Plaintiff's class claims cover this window of time.

[2] Plaintiff subsequently filed a state court action alleging a claim under the UCL. That case is still pending.

3

1  TCA." *Stein v. Pacific Bell, et al.*, 172 Fed.Appx. 192, 194 (9th Cir. Mar. 22, 2006). The Ninth Circuit
2  remanded to this Court for a determination as to whether plaintiff "has alleged, or can allege, violations
3  of § 251 [and] . . . whether violations of interconnection agreements are sufficient to allow Stein to avail
4  himself of §§ 206 and 207." *Id*. at 195. After remand, the Court denied defendants' motion to dismiss
5  and allowed plaintiff to file a third amended complaint. The third amended complaint alleges one cause
6  of action against defendants for violations of section 251 of the Telco Act, as described *supra*.

7  Now before the Court are defendants' motion for summary judgment and defendants' motion
8  to exclude the reports and testimony of Stein's experts, Wilson and Braunstein. Stein opposes the
9  motions, and in the alternative requests a Rule 56(f) continuance to conduct further discovery on the
10 issue of damages.

## LEGAL STANDARD

### 1. Summary judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party need only point out to the Court that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (quoting Fed. R. Civ. P. 56(e)). Where the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. *Id*. at 323.

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must

4

be admissible. *See* Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**2.     Rule 56(f) continuance**

Pursuant to Federal Rule of Civil Procedure 56(f), upon a showing by the party opposing a motion for summary judgment that it "cannot for reasons stated present by affidavit facts essential to justify the party's opposition," the court may deny or continue the motion for summary judgment in order to permit that party an opportunity to obtain necessary discovery. A Rule 56(f) motion should be granted where the party opposing summary judgment makes a timely application that specifically identifies relevant information to be discovered, and there is some basis for believing that such information actually exists, and would prevent summary judgment. *See Nidds v. Schindler*, 113 F.3d 912, 921 (9th Cir. 1996); *Visa Int'l Serv. Ass'n v. Bankcard Holders*, 784 F.2d 1472, 1475 (9th Cir. 1986).

**DISCUSSION**

**1.     Defendants' motion for summary judgment**

Defendants move for summary judgment on two grounds. First, defendants contend that plaintiff has failed to show that defendants violated the Telco Act. Second, defendants argue that even if there is such evidence, plaintiff has failed to show that defendants' Telco Act violations injured Stein or any other consumer. As set forth below, the Court agrees with the latter contention, and concludes that defendants are entitled to summary judgment because plaintiff has failed to show that any alleged Telco Act violations injured plaintiff or consumers. The Court further finds that plaintiff is not entitled to a Rule 56(f) continuance because the discovery that plaintiff seeks would not prevent summary judgment.

Plaintiff relies on the following evidence in opposition to defendants' motion for summary judgment: (1) a 1998 Covad-Pacific Bell arbitration award; (2) "performance measurement" spreadsheets attached to the Declaration of Sandra Faulkender; (3) various FCC orders; (4) the expert reports and testimony of Kenneth L. Wilson and Yale M. Braunstein; and (5) the fact that DSL prices rose during the class period, which was the only period during which defendants were free from FCC

5

oversight. As detailed below, none of this evidence shows that Stein or any other consumer was actually injured as a result of any Telco Act violations.

### A.    Covad arbitration award

In 1998, Covad Communications Company sued Pacific Bell over alleged breaches of the companies' interconnection agreement, *Covad Communications Company v. Pacific Bell*, C 98-1887 SI. This Court compelled arbitration, and by order dated November 24, 1998, the arbitration panel found that Pacific Bell had breached the interconnection agreement by (1) delivering collocation cages late, and (2) by failing to demonstrate that physical collocation was not practical before offering virtual collocation. *See* Katriel Decl. Ex. 5 at ¶¶ 8-9.

The parties dispute the admissibility of the Covad arbitration award. Even if the Covad award was admissible, however, it does not establish that defendants injured any consumers. The award states that "of 18 cages scheduled for delivery to Covad in February 1998, 15 were delivered late," and that "[a]t least 35 out of a total of 77 completed collocation cages have been delivered an average of 35 days beyond the 120-day interval mandated by tariff." Katriel Decl. Ex. 5 at ¶ 8. As an initial matter, the Court notes that the award concerns events that pre-date the class period by several years. More importantly, the award does not state that Covad was excluded from the market as a result of Pacific's actions, or that competition was harmed such that there was any effect on the price that Pacific charged its DSL customers. The award simply does not address the issue of whether consumers were required to pay higher DSL prices during the class period as a result of Pacific's failure to deliver timely collocation cages in 1998.

### B.    Collocation spreadsheets

Plaintiff also relies on various "performance measurement" spreadsheets that were originally attached to the Declaration of Sandra Faulkender in Opposition to Plaintiffs' Motion for Class Certification. *See* Strong Decl. Ex. 21. Faulkender, who was Pacific Bell's Area Manager for Network Engineering West, described Pacific's process for compiling "performance data" concerning Pacific's response time to competitors' requests for collocation arrangements. *See id*. at ¶¶ 3-10. Faulkender

6

attached to her declaration copies of the performance measurement data spreadsheets compiled from January 2000 through January 2002. Plaintiff focuses on the November 2000 spreadsheet, which contains the following entries: for caged collocation, "Missed/Due=%" is "27/27=100%"; for cageless collocation, "Missed/Due=%" is "129/129=100%." *See* Katriel Decl. Ex. 4 (November 2000 spreadsheet). According to plaintiff, these entries show that Pacific Bell routinely missed its collocation deliveries to competitors.

Defendants respond that the spreadsheets contain obvious clerical errors and are internally contradictory, and thus that no reasonable factfinder could accept plaintiff's interpretation. The Court need not resolve this dispute, however, because even accepting plaintiff's interpretation of the spreadsheets, the Faulkender exhibits do not show that consumers were injured. The spreadsheets – as interpreted by plaintiff – show that defendants delayed in providing collocation for less than 4% of the total jobs. The spreadsheets do not show the length of any purported delay or where the delay occurred. Most critically, the spreadsheets do not contain any information about the effect, if any, of a delay. In sum, the spreadsheets do not contain any evidence that any delays affected the competitiveness of the carriers at issue, or that the delays had any effect on the price defendants charged to consumers.

### C.    FCC orders

Plaintiff has also submitted the following FCC orders: (1) a Notice of Apparent Liability ("NAL") issued by the FCC on January 18, 2001, which found that defendants' "failure to timely post notice of exhausted collocation space was willful and repeated," and the FCC's May 24, 2001 Order of Forfeiture based on the January 18, 2001 NAL; (2) a December 20, 2000 NAL which found SBC apparently liable for failing to report certain performance data, and a March 15, 2001 Order of Forfeiture based on the December 20, 2000 NAL; and (3) an October 16, 2001 NAL which found that defendants made "inaccurate statements in three affidavits" regarding how defendants' loop qualification system worked, and a related May 28, 2002 Consent Decree under which defendants agreed to pay the United States Treasury $3,600,000 without admitting any wrongdoing. *See* Katriel Decl., Ex. 2 & Strong Decl. Ex. 9 (January 18, 2001 NAL and May 24, 2001 Order of Forfeiture); Katriel Decl. Ex. 6 & 7 (December 20, 2000 NAL and March 15, 2001 Order of Forfeiture); Strong Decl. Ex. 11 & 15 (October

16, 2001 NAL and May 28, 2002 consent decree).

### **(1)  January 18, 2001 NAL and May 24, 2001 Order of Forfeiture**

In the January 18, 2001 NAL, the FCC found that SBC had "apparently violated the Commission's rule requiring incumbent local exchange carriers (ILECs) promptly to post notices of premises that have run out of collocation space." Katriel Decl. Ex. 2 at ¶ 1. After receiving a written response from SBC, the FCC imposed an Order of Forfeiture in the amount of $94,500. Strong Decl. Ex. 9. Plaintiff emphasizes the following language contained in the Order of Forfeiture:

> SBC's assertion that no competitor or consumer was harmed by its posting policy likely is false. Information submitted to the Bureau by SBC strongly suggests that several CLECs applied for collocation space from SBC where no such space remained, and were accordingly denied collocation by SBC. Had SBC complied with the Commission's collocation space exhaustion posting rule, such denials likely would not have occurred as the CLECs would have been on notice as to the space exhaustion and would not have applied for space or had to incur the related costs of such applications.

*Id*. at ¶ 15. The FCC concluded that the forfeiture amount was justified "in light of the number of SBC's violations and the *possible* competitive harm caused by the violations." *Id*. at ¶ 17 (emphasis added).

The Court finds that FCC's order does not establish that any competitor or consumer was actually harmed by SBC's posting policy. Notably, the FCC used modifying language such as "likely," and "possible," and the FCC did not make any finding that any competitor or consumer was actually harmed by SBC's late posting. Instead, the FCC noted that a carrier *may* have submitted an application for collocation for an exhausted office that it might not have submitted if SBC had timely posted the information. *See id*. at ¶ 15. The FCC did not evaluate whether any competing carrier's costs were increased so as to affect its DSL price, or whether SBC was able to increase its DSL price as a result of the posting policy.

### **(2)  December 20, 2000 NAL and March 15, 2001 Order of Forfeiture**

On December 20, 2000, the FCC issued an NAL, finding SBC apparently liable for "fail[ing] to report certain performance data in accordance with the published Business Rules . . . that SBC has agreed to undertake as part of the merger conditions adopted in the SBC/Ameritech Merger Order." Katriel Ex. 6 at ¶ 1. After receiving SBC's response to the NAL, the FCC issued an Order of Forfeiture

8

in the amount of $88,000. *Id*. Ex. 7.

The NAL states that SBC was required to file with the FCC and each of the relevant state commissions, on a monthly basis, performance data reflecting 20 different categories covering key aspects of pre-ordering, ordering, provisioning, maintenance and repair associated with unbundled network elements, interconnection, and resold services. *See* Katriel Decl. Ex. 6 at ¶ 5 & n.13. The NAL noted that SBC incorrectly reported data by, *inter alia*, using standard time instead of military time, combining certain data into a single category rather than disaggregating it into several categories, and improperly excluding certain data from reported categories. *Id*. at ¶ 12.

The Court finds that FCC orders do not show that the reporting violations affected DSL service, SBC's competitors, or consumers. Neither the NAL nor the Order of Forfeiture contain any findings about the effect, if any, of the reporting discrepancies, and plaintiff does not explain how any of these reporting violations affected the DSL market in California.

### (3) October 12, 2001 NAL and May 28, 2002 Consent Decree

The final FCC orders concern loop qualification.[3] In an October 12, 2001 NAL, the FCC proposed to fine SBC, and ultimately entered into a consent decree, regarding SBC's submission of affidavits that inaccurately and misleadingly described SBC's system. *See generally* Strong Decl. Ex 11; *see also* Strong Decl. Ex. 15 (consent decree). For a time during the class period, SBC provided computerized information only for the first loop that had been inventoried in the system, rather than on all loops serving a particular premises. The October 12, 2001 NAL details at great length how SBC submitted three affidavits "asserting that SBC's system worked in a manner contrary to the facts." Strong Decl. Ex. 11 at ¶ 14.

The Court finds that the FCC orders do not establish that SBC's loop qualification system had any effect on the DSL market or consumers. Although plaintiff argues that SBC's loop qualification system was misleading, the October 12, 2001 NAL states:

---

[3] Loop qualification is the process by which an incumbent local exchange carrier provides information about the makeup of its loops to competing carriers so that these competitors can discern whether the loops servicing a particular premise are capable of supporting DSL. This information is used by competitors to determine whether they can offer DSL service to a particular customer.

9

> Based on the evidence generated during this investigation, we conclude that SBC's provision of loop qualification information between October 26, 2000 and April 3, 2001 *met the requirements of section 271*. Although the evidence indicates that SBC's loop qualification system in some instances provided detailed information on a fiber loop even when a copper loop was available for a particular address, we find *this was not competitively significant* under the circumstances in this case.

Strong Decl. Ex. 11 at 36, ¶ 90 (emphasis added). The FCC also noted that "[b]ased upon the record in this proceeding, (i) these circumstances occurred no more than five percent of the time, and (ii) even in those cases, the inquiring customer would be informed about copper loops in the distribution plant serving a customer's general area, at which point the customer could request detailed information on copper loops through a manual query at no additional charge." *Id*. at 36 n. 137.

Plaintiff has not submitted any evidence that SBC's system for providing loop qualification information affected the price that he and other consumers paid in California during the class period. Even if defendants' loop qualification information was returning erroneous information to competitors at least 30% of the time, as plaintiff asserts, plaintiff still has not submitted any evidence that SBC's system resulted in any denials of service, the degree to which any denials of service occurred in California, or the degree to which any competing carrier was affected, if at all.

### D. Braunstein expert report

Plaintiff has submitted the expert report and deposition testimony of Yale Braunstein in order to show that Stein and other consumers paid supra-competitive prices for DSL service during the class period as a result of Pacific Bell's allegedly illegal conduct. Braunstein is a Professor in the School of Information Management and Systems at the University of California, Berkeley, where he has been on the faculty for over nineteen years. Strong Decl., Ex. 18 ¶ 4. Braunstein holds an M.A. and Ph.D. in economics from Stanford University. *Id*. ¶ 6.

Braunstein first determined that the "effective" price that Stein and class members paid for defendants' DSL service during the class period was between $39.95 and $49.95. *Id*., Ex. 1. Braunstein calculated two sets of effective monthly prices, one based on a one-year time horizon, and one based on three-year time horizon. *Id*. ¶ 24. Braunstein then calculated the "competitive" price for the class period, and concluded that "absent anti-competitive behavior, the price for DSL in California would

have been between $25.00 and $36.45 per month during the class period and that damages range from $77.2 million to $183.2 million, before tripling." *Id.* ¶ 32. The damages amounts represent the differences between the "competitive" price and the effective price.

Braunstein calculated the "competitive" prices as follows. To determine the high end of the "competitive" range – $36.45 per month – Braunstein looked at defendants' price for DSL service in late 2002 and early 2003. Strong Decl., Ex. 18 ¶ 26. During this time, defendants charged $29.95 per month for the first six months, and $42.95 thereafter. *Id.* Braunstein then calculated that if consumers subscribed to DSL for one year under this price structure, they would be paying an average of $36.45 per month during that first year. Braunstein noted that at the time he wrote his expert report, Spring 2003, the price for DSL was $34.95. *Id.*

In order to determine the low end of the "competitive" range – $25.00 per month – Braunstein used Covad's estimate for a competitive price for DSL service. *Id.* ¶ 27. Braunstein states:

> Covad, a competing provider of DSL service, testified that absent the anti-competitive acts of Pac Bell and the other local exchange companies upon which it had to rely for access to local lines it believed the competitive price for DSL was approximately $25 per month.

*Id.* Braunstein stated that he had reviewed two Covad documents from the late 1990s that supported Covad's estimate: an undated Powerpoint presentation and an April 1998 declaration that was submitted to the California Public Utilities Commission on behalf of Covad. *Id.* Braunstein does not provide any details regarding either document, nor does he specifically explain why these documents provide a "sound economic basis for [his] estimate." Instead, Braunstein generally states,

> Covad shows that with a reasonable set of projections of equipment costs, marketing, and other expenses they will be able to achieve a reasonable profit at the $25 price level. Their analysis shows and supports positive cash flow contributions under three different price scenarios when competing with SBC. With the $25 price and the projected cost reductions, Covad projects it will break even (on a cash flow basis) after 31 months. This break-even point is 34 months when averaged across all ILECs.

*Id.*

Braunstein also states that the $25.00 price is supported by the fact that defendants lowered their price for DSL in "selected markets" to $24.95 as of April 4, 2003. *Id.* ¶ 28. Braunstein notes that this lowered price "has several conditions," but does not provide any information regarding those conditions. *Id.* Lastly, Braunstein states that the $25 competitive price was further supported by the fact that Yahoo

11

1 Japan offered DSL service in December 2002 for approximately $22.00/month; Braunstein notes that
2 "[t]his is in a DSL market with four competitors" . . . "[i]n other words, in a DSL market that is
3 competitive, the $25 monthly price for DSL is a reality." *Id*. ¶ 29. Braunstein does not explain why the
4 DSL market in Japan is a valid comparator for the DSL market in California during the class period.

5 Defendants raise two primary objections to Braunstein's report and testimony. First, defendants
6 contend that Braunstein did not link damages to the challenged conduct, and thus his opinion is not
7 based on the facts of the case. Second, defendants contend that Braunstein's methodology for arriving
8 at the "competitive" price is flawed because, *inter alia*, he used prices in a later period as the proxy for
9 competitive prices during the class period without adjusting for lawful differences between the periods.
10 In addition, defendants contend that Braunstein's methodology is flawed because, contrary to
11 Braunstein's statement in his expert report, Covad did not state that $25/month was a "competitive"
12 price, but rather Covad stated that it believed a $25/month price would destroy its economics absent
13 major cost reductions. *See* Strong Decl. Ex. 19 at 204 (Braunstein deposition testimony acknowledging
14 same).

15 The Court agrees that Braunstein's expert report fails to connect any alleged Telco Act violation
16 with the damages purportedly suffered by consumers during the class period.[4] Braunstein never
17 identifies the allegedly unlawful conduct giving rise to Pacific Bell's supposedly supra-competitive
18 prices. Instead, Braunstein simply opines about what the DSL price would have been "absent anti-
19 competitive behavior" without identifying the "anti-competitive behavior" or analyzing how that
20 behavior led to the excessive prices. *Id*. ¶ 32. Indeed, Braunstein admitted in his deposition that he
21 never attempted to determine to what extent any of Pacific Bell's allegedly illegal activities caused
22 damage to consumers:

23 Q. Did you attempt to analyze what portion of the alleged overcharge or damages was caused by violation of a particular FCC rule?
24
25 A. No.

26 Q. Did you attempt to evaluate what portion of the overcharge was attributable to delays by Pacific Bell in providing co-location to Covad?

27
---
28 [4] As such, the Court does not address the parties' arguments regarding Braunstein's methodology.

12

|   |    |                                                                    |
|---|----|--------------------------------------------------------------------|
| 1 | A. | No.                                                                |
| 2 | Q. | Or delays in providing loops to Covad?                             |
| 3 | A. | No.                                                                |
| 4 | Q. | Or violations by SBC as determined in particular FCC decisions?    |
| 5 | A. | No, I have not.                                                    |
| 6 | Q. | Or in PUC decisions?                                               |
| 7 | A. | No.                                                                |

Strong Decl. Ex. 19 at 192-93.

Relying on *LePage's Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003) (en banc), plaintiff argues that Braunstein is not required to disaggregate damages caused by defendants' unlawful activity from those caused by lawful activity. In *LePage's,* an antitrust action, the defendant argued that the jury did not have a proper basis to determine damages because the plaintiff's expert did not disaggregate damages. *Id.* at 166. The *LePage's* court held that "[o]nce a jury has found that the unlawful activity caused the antitrust injury, the damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork." *Id.* (quoting *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 813 (3d Cir.1984)).

Plaintiff's argument misses the mark. *LePage's* is distinguishable because there the jury had already determined that the defendant's actions harmed the plaintiff; the only question was to what extent. *LePage's*, 324 F.3d at 166. Here, the problem is not that Braunstein has failed to separate out the damages caused by Telco Act violations, but rather that he did not offer any facts or analysis to show that there was any causal injury at all. The other cases cited by plaintiff are similarly distinguishable in that they require a showing of causation and injury as a predicate for calculating damages.

As the Ninth Circuit has stated, "[t]here is nothing inconsistent between requiring proof that damages were caused by illegal acts and the rule that a plaintiff need not disaggregate damages among those acts found to be unlawful." *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) (summary judgment proper where damages study is speculative and does not separate effects of lawful and unlawful activity). "'When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion

13

unreasonable, it cannot support a jury's verdict.'" *Rebel Oil Co. Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) (*quoting Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)); *see also SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("Expert testimony that offers only a bare conclusion is insufficient to prove the expert's point."). Because Braunstein fails to present any evidence or analysis showing that defendants' alleged Telco Act violations caused injury to consumers, the Court GRANTS defendants' motion to exclude Braunstein's report.

### F. Wilson's expert report and testimony

Plaintiff also offers the expert report and testimony of Kenneth Wilson as evidence that defendants violated the Telco Act and injured competitors. Wilson is a Senior Consultant and member of Boulder Telecommunications Consultants, L.L.C., in Boulder, Colorado. Strong Decl., Ex. 16 ¶ 3. Wilson holds an M.S. and Ph.D. in electrical engineering from the University of Illinois. *Id.* ¶ 4.

In his expert report, Wilson opines that defendants' failure to provide timely collocation and adequate loop qualification information caused CLECs additional costs and time. *Id.* ¶¶ 22, 32. Specifically, Wilson states that defendants "regularly provided inaccurate and incomplete information to CLECs with their loop qualification tools through at least April of 2001." *Id.* ¶ 19. Wilson concludes that this failure resulted in additional costs for CLECs offering DSL in California. *Id.* ¶ 22. In addition, Wilson states that "Pac Bell has denied and slowed collocation for its competitors, including Covad and Sprint, over an extended period of time. These practices cost CLECs time and resources." *Id.* ¶ 27. Wilson states, "CLECs depend on information from Pac Bell with respect to the availability of collocation space. Such information is necessary for planning market entry in areas where they have previously not sought collocation. The FCC found that Pac Bell had failed to give proper notice to CLECs regarding central offices where collocation space was exhausted. This type of failure causes uncertainty as to the availability of space and can affect market plans." *Id.* ¶ 29. Finally, Wilson explains that "Pac Bell has caused additional costs to be incurred by CLECs through its collocation processes." *Id.* ¶ 32.

Wilson admitted in his deposition that the bases for his opinions were (1) the 1998 Covad-Pacific

14

Bell arbitration award; (2) the FCC's October 12, 2001 NAL and May 28, 2002 Consent Decree regarding loop qualification; (3) complaints filed by Sprint in 2001 with the California PUC regarding three central offices that Pacific stated had no more space for physical collocation[5]; and (4) the "performance data" spreadsheets attached to the Faulkender declaration. Despite generalized statements in Wilson's report about "CLECs," Wilson admitted in his deposition that did not conduct any independent research or analysis: he did not interview anyone; he did not use any methodology to determine whether competitors' costs increased; and he did not study whether, and to what extent, any collocation delays impacted competitors' business plans. *See*, *e.g.*, Strong Decl. Ex. 8 at 152:14-153:12.[6]

---

[5] Wilson's report states that "Sprint documented [collocation] problems through 2001. Sprint concluded, 'Pacific's practices and policies (for collocation) are patently anticompetitive.' Since Pac Bell generally maintains the same practices and policies statewide, Sprint's experience cannot be unique." Strong Decl. Ex. 16 at ¶ 53. Wilson's report does not identify the source for the quotation, but plaintiff states Wilson reviewed a declaration that Steven M. Broom, Sprint's Manager of Network Product and Processes for Broadband Local Networks, filed with the California PUC in 2001. *See* Pl's Opposition to Motion to Exclude Experts at 17. The parties have not submitted a copy of that declaration, although defendant did submit excerpts of Broom's deposition testimony. *See* Strong Decl. Ex. 10. Plaintiff did not submit any evidence that the Sprint collocation requests at issue involved DSL service, as opposed to some other service.

[6] In his deposition, Wilson testified as follows:

Q   Have you done any investigation or analysis of how many CLECs applied for space that turned out to be exhausted when they would not have done so if the web site had been up to date?

A   No, I haven't called CLEC[s] about that specifically.

Q   Or have you analyzed the costs to the CLEC of any untimeliness in posting that information on the web site?

A   That I have discussed and that has been a topic of the discussion in hearings and workshops I've been in and [the] CLEC unanimously says it is a costly process for them to request – have a business plan that needs it, requests it and then be rejected.

Q   For purposes of your report or your testimony here, have you done anything to quantify that cost?

A   No.

Q   And have you done anything to investigate or study the impact of collocation delays on the business plans of Covad or other CLEC?

A   No, not directly. Some of that was tied up in the award, the AAA arbitration award.

Defendants move to exclude Wilson's report and testimony on the ground that Wilson does not offer any expert opinions based on scientific or specialized knowledge. Instead, defendants contend that Wilson simply parrots information, and draws unsupported inferences, from information contained in the documents listed *supra*. Plaintiff argues that Wilson's report and testimony are admissible because Wilson personally negotiated interconnection agreements as part of his former job duties, and thus he is able to inform the jury about what collocation entails, its importance, and the impact that collocation denials will have on Pacific Bell's competitors. Plaintiff also emphasizes the fact that Wilson has acted as an expert witness in various antitrust and trade secrets cases. However, plaintiff does not deny that Wilson did not conduct any independent research or analysis, nor does plaintiff deny that Wilson's opinions about collocation delays and resulting increased costs suffered by competitors are based solely on the above-listed documents.

An expert's work is only admissible if it is "reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). Federal Rule of Evidence 703 governs the allowable facts or data upon which an expert can base his opinions. *See* Fed. R. Evid. 703. "Rule 703 does not sanction the simple transmission of hearsay." *United States v. Tomasian*, 784 F.2d 782, 785-86 (7th Cir. 1986); *see also SMS Sys. Maint. Servs., Inc.*, 188 F.3d at 25 ("Expert opinions . . . are no better than the data and methodology that undergird them . . . .").

The Court concludes that Wilson's report and testimony should be excluded. Wilson admitted that he did not engage in any independent fact-finding to reach his conclusions. Instead, Wilson reviewed various documents and then restated as his "opinions" the findings or allegations in those materials. For example, Wilson relied on the "fact" that Pacific Bell refused to provide physical collocation for Covad in central offices to conclude that Pacific Bell's conduct caused Covad and other CLECs to lose "time and resources." Strong Decl. Ex. 16 ¶ ¶ 52, 27. There is nothing in Wilson's report to support such a conclusion as to Covad, much less for any other competitor. Wilson did not interview anyone at Covad, nor did he examine a single Covad document. Wilson admitted in his

---

Q But other than reading that award, you haven't done anything on that subject, correct?

A I have not done an independent analysis, no.

16

deposition that the sole source of his information about Covad was the Covad arbitration award. In essence, Wilson's report merely summarizes the findings of the arbitration award, and draws a number of conclusion based solely on speculation.

Wilson follows the same approach with respect to the FCC loop qualification order,[7] the "performance data" spreadsheets, and Sprint's complaints to the California Public Utilities Commission. For example, with the Sprint complaints, which would appear to be inadmissible hearsay, Wilson admitted in his deposition that he only reviewed the complaints, and did not conduct any investigation as to Pacific Bell's response or the CPUC's action on the complaints. *See* Strong Decl. Ex. 8 at 114-118. There is simply no factual basis for Wilson's conclusion that, because Sprint filed complaints about collocation denials, therefore Pacific Bell engaged in anti-competitive practices throughout California. Accordingly, the Court GRANTS defendant's motion and excludes Wilson's report and testimony. *See Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499 (9th Cir. 1994) (expert's testimony may be properly rejected in analyzing a summary judgment motion where the supporting data or scientific methodology supporting it is inadequate); *see also Lang*, 217 F.3d at 924 (excluding expert report that did "little more than parrot" client's position).[8]

---

[7] Regarding the loop qualification information issue, Wilson testified:

Q. Have you made any analysis of the additional costs imposed on CLEC[s] because of this incomplete loop qualification process?

A. No, I haven't made an independent analysis of that

Q. Has anybody made analysis under which you've relied for that?

A. No.

Q. And have you attempted to identify the extent to which that incomplete loop qualification information impacted Covad in particular?

A. No, not specifically.

Strong Decl. Ex. 8 at 142:24-143:10.

[8] Moreover, even if Wilson's report was admissible, it still fails to show that Pacific Bell's alleged Telco Act violations injured plaintiff or any consumer. For the reasons stated *supra*, there is nothing in the Covad arbitration award, the FCC's loop qualification orders, or the spreadsheets attached to the Faulkender declaration that shows that Pacific Bell's alleged violations of the Telco Act led to higher DSL prices in California during the class period. Similarly, there is no information in Wilson's

### G. Price of DSL during class period

Plaintiff contends that even if the expert reports are excluded, a jury could reasonably infer that the price of DSL rose during the class period due to the anticompetitive conduct of defendants, since that was the only time defendants were free from FCC oversight. Plaintiff points to the fact that defendants' rates dropped from $49.95 per month to $29.95 per month once the FCC reconvened oversight of DSL at the end of the class period.

The fact that the price for DSL service after the class period was less than the price for DSL service during the class period does not provide a sufficient basis for concluding that the price during the class period was supra-competitive, or that it was the result of unlawful conduct. Courts have consistently rejected "before-and-after" models when experts failed to perform regression analysis or otherwise account for variables in the marketplace. *See Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040-41 (8th Cir. 1999) ("before-and-after" damages model rejected because it did not consider "all independent variables that could affect the conclusion"); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1504 (D. Kan. 1995) ("before-and-after" model flawed because it assumed that "the conspiracy was the sole cause of the price difference between the conspiracy period and the normative period.").

### 2. Rule 56(f) Continuance

In the alternative, Stein asks the Court to grant a continuance pursuant to Rule 56(f) in order to complete discovery on damages. In August 2006, plaintiff served defendants with a set of supplemental document requests, to which defendants have not yet provided a substantive response. *See* Katriel Decl. Ex. 11. The requests seek documents showing defendants' costs, revenues, and profits in providing

---

report regarding the impact, if any, of the collocation denials over which Sprint filed complaints in 2001.
    Finally, Wilson's report does not contain a determination of the amount of increased costs incurred by Covad or any other CLEC. Nor does Wilson analyze the number of competitors in the market, the size of their operations, their business plans, or any other information that could enable a juror to know whether the alleged increased costs had a material effect on the state of competition in the DSL market. Significantly, Wilson *never* suggests that any injury to Pacific Bell's competitors was passed on to the class. Wilson's expert report therefore fails to show that defendants' alleged Telco Act violations injured consumers.

DSL. According to plaintiff, "[t]his documentation and information is germane to the question of damages because it will allow plaintiff to address, *inter alia*, defendants' summary judgment contention that the reason that the post-class period prices for DSL dropped was due not to any anticompetitive conduct, but to lawful reasons like a decline of costs associated with providing DSL." *Id*. ¶ 18.

The Court finds that plaintiff is not entitled to a Rule 56(f) continuance because the requested discovery would not prevent summary judgment. *See Nidds*, 113 F.3d at 921. Even if plaintiff could show that the drop in DSL prices following the class period was not due to a decline in defendants' costs of providing DSL, plaintiff still would not have any evidence that defendants' conduct had any effect on competing carriers, or that consumers were charged higher DSL prices as a result of alleged Telco Act violations. Since the requested discovery does not go to the issue of causation, the request for a Rule 56(f) continuance is denied.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion for summary judgment and GRANTS defendants' motion to exclude reports and testimony of Stein's experts Wilson and Braunstein. (Docket Nos. 393 and 394). The Court DENIES plaintiff's request for a Rule 56(f) continuance. Defendants' objections to plaintiff's evidence are DENIED as moot. (Docket No. 428). Defendants' motion to dismiss the Second Amended Complaint is DENIED as moot. (Docket No. 369).

**IT IS SO ORDERED.**

Dated: March 19, 2007

SUSAN ILLSTON
United States District Judge